# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Derek Eisenberg, | Case No.: 2:24-cv-02377-JAD-MDC |
|     Plaintiff | |
| v. | **Order Granting in Part and Denying in Part Motion to Dismiss with Limited Leave to Amend by November 6, 2025** |
| Dr. Kristopher Sanchez, et al., | |
|     Defendants | [ECF No. 21] |

Nevada law requires real-estate brokers to keep an in-state office, transact all business authorized by their license at that office, and maintain records for inspection at that office. New Jersey-based real-estate broker Derek Eisenberg brings a multifaceted constitutional challenge to that statutory scheme, claiming that it violates the Commerce Clause, the Privileges and Immunities Clause of Article IV, the Privileges or Immunities Clause of the Fourteenth Amendment, the Equal Protection Clause, and the Due Process Clause. The State moves to dismiss under Federal Rule of Civil Procedure 12(b)(6), asserting that Eisenberg cannot show that the statute violates Article IV's Privileges and Immunities Clause or the Commerce Clause because the statute imposes the same burdens on in-state and out-of-state brokers, so it does not discriminate against out-of-state brokers or unduly burden interstate commerce. The State also argues that Eisenberg cannot overcome the high level of deference owed to economic regulations under the Equal Protection and Due Process Clauses. Finally, the State contends that the *Slaughter-House Cases*, which held that the Privileges or Immunities Clause of the Fourteenth Amendment protects only the very narrow privileges accruing from United States citizenship, foreclose Eisenberg's claim under that clause.

Most of the State's arguments are meritorious. Eisenberg has not plausibly alleged that requiring in-state and out-of-state brokers to maintain and operate out of a Nevada-based office violates the Privileges and Immunities Clause of Article IV, the Privileges or Immunities Clause of the Fourteenth Amendment, the Equal Protection Clause, or the Due Process Clause. But the core of Eisenberg's case survives: he has plausibly alleged that requiring brokers to keep an in-state office and to transact all business authorized by their license at that office violates the dormant Commerce Clause. So I deny the motion to dismiss that claim but grant it as to all others.

**Background**

Chapter 645 of the Nevada Revised Statutes (NRS) regulates real-estate brokers. Under that statutory scheme, brokers must maintain a definite place of business in Nevada and designate it in their license.[1] Brokers must perform the services authorized by their license at that business address only.[2] Similarly, Chapter 645 of the Nevada Administrative Code (NAC) requires brokers to maintain a complete record of each real-estate transaction in their Nevada office and to make those records available for inspection.[3]

Eisenberg is a real-estate broker based in New Jersey and licensed in more than half of the United States, including Nevada.[4] He maintains an office here as the statutory scheme

---

[1] Nev. Rev. Stat. § 645.550(1).

[2] Nev. Rev. Stat. §§ 645.510, 645.550(3).

[3] Nev. Admin. Code § 645.655. The regulations also allow brokers with a home to designate a room as an office. Nev. Admin. Code § 645.627. Although Eisenberg's complaint challenges that regulation, neither party meaningfully addresses it in their briefs.

[4] ECF No. 1 at 5–6.

2

dictates.[5]  But he contends that the in-state office requirement is unconstitutional and anticompetitive, so he sues the Director of Nevada's Department of Business and Industry and the members of the Nevada Real Estate Commission (collectively "the State").[6]  Eisenberg prays for a declaration that the statutory scheme violates the Commerce Clause, Article IV's Privileges and Immunities Clause, the Privileges or Immunities Clause of the Fourteenth Amendment, the Equal Protection Clause, and the Due Process Clause.[7]

The State moves to dismiss, arguing that Eisenberg's Commerce Clause claim fails as a matter of law.[8]  It theorizes that this court can side-step many of the constitutional issues because the statute does not impose requirements as onerous as Eisenberg suggests.[9]  And even if it did, the State argues, Eisenberg cannot show the discrimination needed for a per se violation of the dormant Commerce Clause because the laws require both in-state and out-of-state brokers to maintain and work out of their in-state offices.[10]  Nor can he rely on an alternative theory based on a discriminatory effect or a burden on interstate commerce because, in the State's estimation, any burdens are only incidental and outweighed by the law's benefits, which are increased access and accountability for brokers.[11]

---

[5] *Id.* at 6.  Based on publicly available state records, the State requests that I take judicial notice of this fact and that his office address is shared with many other brokers.  ECF No. 22. Eisenberg does not contest that, so I take judicial notice.  *See* ECF No. 23.

[6] ECF No. 1 at 3–4.

[7] *Id.* at 12.

[8] *See generally* ECF No. 21.

[9] ECF No. 24 at 1–2.

[10] ECF No. 21 at 7–8.

[11] *Id.* at 6–10; ECF No. 24 at 3–6.

The State also moves to dismiss the remaining constitutional claims.[12]  For similar reasons, the State contends that Eisenberg's Article IV Privileges and Immunities Clause claim fails because Eisenberg's complaint does not allege that the laws facially discriminate.[13]  It also argues that the law survives rational-basis review under the Equal Protection and Due Process Clauses because it is logically related to ensuring that brokers "are knowledgeable of the applicable state law and subject to professional standards that help prevent fraud and ensure minimum competence" and accessible to clients and state investigators.[14]  Finally, the State asserts that Eisenberg's Fourteenth Amendment Privileges or Immunities Clause claim is a dead letter under Supreme Court precedent.[15]

## Discussion

Federal pleading standards require a plaintiff's complaint to include enough factual detail to "state a claim to relief that is plausible on its face."[16]  This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation";[17] plaintiffs must make direct or inferential factual allegations about "all the material elements necessary to sustain recovery under *some* viable legal theory."[18]  A complaint that fails to meet this standard must be dismissed.[19]

---

[12] ECF No. 21 at 11–14.

[13] *Id.* at 11.

[14] *Id.* at 12–14.

[15] *Id.* at 12.

[16] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[17] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[18] *Twombly*, 550 U.S. at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

[19] *Id.* at 570.

4

**A.    The State has not offered a "readily susceptible" construction of NRS 645.510 and NRS 645.550 that avoids Eisenberg's constitutional challenges.**

As a threshold matter, the parties dispute—at least superficially—just what Nevada's brokerage law requires.  Statutory schemes challenged under the Commerce Clause should be read as a whole.[20]  But federal courts "must accept a narrowing construction to uphold the constitutionality of an ordinance if its language is 'readily susceptible' to it."[21]

NRS 645.550(1) provides that brokers must "maintain a definite place of business within the State . . . which must serve as the office for the transaction of business under the authority of the license."  NRS 645.510 states that "[n]o real estate license . . . shall give authority to do or perform any act specified in this chapter . . . from any place of business other than that specified therein."  And NRS 645.550(3) adds that "[n]o license authorizes the licensee to transact business from any office other than that designated in the license."

Eisenberg interprets this statutory scheme as requiring real-estate brokers to "operate out of a physical office in the state."[22]  The State construes it to mean that "Nevada does not require all business be conducted in-state"[23] and to require only "that licensees maintain an office location of record, which serves as the licensee's official address," so it does not "require[] licensees to perform their professional functions, chained to their desks, confined to a physical office location."[24]

---

[20] *See W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994).

[21] *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 942 (9th Cir. 1997) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988)); *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 447 (9th Cir. 2019).

[22] ECF No. 23 at 4.

[23] ECF No. 24 at 5.

[24] *Id.* at 2.

But the State offers no rationale for its construction, which contradicts the plain language of §§ 645.510 and 645.550(3). Those provisions prohibit brokers from transacting business at "any place of business other than" the office specified in the license.[25] While this court must accept any readily susceptible, narrow construction of the statute to uphold its constitutionality, the State's construction would effectively read §§ 645.510 and 645.550(3) out of the statutory scheme, which this court cannot do.[26] So I decline to accept the State's construction that Nevada's brokerage law does not require brokers to transact business authorized by their license at their in-state offices.

**B.    Eisenberg has plausibly alleged that Nevada's brokerage laws violate the dormant Commerce Clause.**

Eisenberg leads his constitutional assault on these statutes by invoking the dormant Commerce Clause. "The Commerce Clause affirmatively grants to Congress the power to regulate interstate commerce."[27] "The undisputed corollary of that principle is that the Commerce Clause . . . by its own force created an area of trade free from interference by the [s]tates."[28] This "dormant" effect of the Commerce Clause displaces any economically protectionist state laws "designed to benefit in-state economic interests by burdening out-of-state

---

[25] *See* Nev. Rev. Stat. §§ 645.510, 645.550(3).

[26] *Harris Assocs. v. Clark County Sch. Dist.*, 81 P.3d 532, 535 (Nev. 2003) ("when construing statutory language, "no part of a statute should be rendered meaningless").

[27] *Rosenblatt*, 940 F.3d at 443–44.

[28] *Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388, 403 (1984) (cleaned up).

competitors."[29]  As Justice Cardozo famously wrote,[30] "The Constitution was framed . . . upon the theory that the peoples of the several states must sink or swim together . . . ."[31]

Challenges under the dormant Commerce Clause are two tiered.  A court will invalidate a state law as a per se violation if it "directly regulates" interstate commerce[32] or "discriminates against interstate commerce either on its face or in practical effect."[33]  Otherwise, the court will apply the balancing test articulated in *Pike v. Bruce Church, Inc.*, which invalidates a law "if the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."[34]

Dual considerations influence this inquiry.  The first is a logistical one.  By the Supreme Court's own characterization, dormant Commerce Clause jurisprudence is a "quagmire"[35] that "has ebbed and flowed over time,"[36] and "no clear line separate[s] the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the" *Pike* balancing test.[37]  The second is a historical-perspective one.  The court must be mindful of the judiciary's misadventure in *Lochner v. New York*[38] and its progeny in which a

---

[29] *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023).

[30] And a certain multi-talented constitutional-law professor has been known to sing it.

[31] *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935).

[32] *Rosenblatt*, 940 F.3d at 444 (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986)).

[33] *Maine v. Taylor*, 477 U.S. 131, 138 (1986); *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010).

[34] *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

[35] *See, e.g.*, *Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959).

[36] *Flynt*, 131 F.4th at 923.

[37] *Brown-Forman Distillers*, 476 U.S. at 579.

[38] *Lochner v. New York*, 198 U.S. 45, 57 (1905), *overruled by Day-Brite Lighting Inc. v. Missouri*, 342 U.S. 421 (1952).

particularly activist Supreme Court used a broad interpretation of Fourteenth Amendment substantive due process to invalidate laws that offended the majority's economic philosophy.[39] But as the judiciary came to realize decades later, "[c]ourts should be careful not to extend [constitutional] prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular [c]ourt may happen to entertain."[40]   As a result, challenges under the dormant Commerce Clause are now a limited inquiry to "smoke out" hidden protectionism, not a "freewheeling" judicial license to resurrect the *Lochner* era.[41]   And challengers "face a heavy burden."[42]   Although the Supreme Court has occasionally invalidated state laws as per se violations in recent years,[43] it "has not invalidated a law under *Pike* in more than 30 years."[44]

---

[39] *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 691 (1999) ("We had always thought that the distinctive feature of *Lochner*, nicely captured in Justice Holmes's dissenting remark about "Mr. Herbert Spencer's Social Statics," . . . was that it sought to impose a particular economic philosophy upon the Constitution."); *Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) ("The doctrine that prevailed in *Lochner* [and its progeny]—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded.  We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws."); *United States v. Lopez*, 514 U.S. 549, 605 (1995) (Souter, J., dissenting) ("It is most familiar history that during [the *Lochner*] period the Court routinely invalidated state social and economic legislation under an expansive conception of Fourteenth Amendment substantive due process."); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 591–92 (2011) (Breyer, J., dissenting) ("history shows that the power was much abused" during the *Lochner* era "and resulted in the constitutionalization of economic theories preferred by individual jurists").

[40] *Ferguson v. Skrupa*, 372 U.S. 726, 729 (1963) (quoting *Tyson & Brother, etc. v. Banton*, 273 U.S. 418, 445 (1927) (Holmes, J., dissenting)).

[41] *Nat'l Pork Producers*, 598 U.S. at 379–82 (citing *Lochner*, 198 U.S. 45 (Holmes, J., dissenting)) (plurality opinion).

[42] *Flynt v. Bonta*, 131 F.4th 918, 931 (9th Cir. 2025).

[43] *See, e.g.*, *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 543 (2019).

[44] *Flynt*, 131 F.4th at 931 (quoting *Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023)) (cleaned up).

1

*1.    Eisenberg has plausibly alleged a per se violation of the dormant Commerce Clause.*

Discrimination between in-state and out-of-state residents per se violates the dormant Commerce Clause.  Discrimination is the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."[45]  A state law may discriminate facially, purposefully, or in practical effect.[46]  If a state law is discriminatory, a showing that the law is narrowly tailored to "advance a legitimate local purpose" may still sustain it.[47]  The party challenging a regulation has the burden of showing a discriminatory purpose or effect.[48]

Eisenberg concedes that Nevada's brokerage law is facially neutral.[49]  He instead contends that the law discriminates in practical effect by reducing the competitiveness of similarly situated, out-of-state real-estate brokers.[50]  The State counters that any discriminatory effect is incidental and therefore not a per se violation.[51]

A state law discriminates in practical effect if it would cause out-of-state residents to suffer a "competitive disadvantage as compared to other similarly situated" in-state residents.[52]

---

[45] *Black Star Farms*, 600 F.3d at 1230.

[46] *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009).

[47] *Flynt*, 131 F.4th at 923.

[48] *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 400 (9th Cir. 2015).

[49] ECF No. 23 at 5.

[50] *Id.*

[51] ECF No. 24 at 3–4 (citing *Rosenblatt*, 940 F.3d 439).

[52] *Int'l Franchise Ass'n*, 803 F.3d at 403–05 (finding that the district court "considered measures well-suited to evaluating the effects of the ordinance" when it evaluated whether the ordinance increased the costs for a particular type of business model, created barriers to entry, raised the labor costs in a way that will impact the flow of interstate commerce, caused franchisees to close or reduce operations, or generally affected interstate commerce); *Rosenblatt*, 940 F.3d at 448

9

1  State laws that effectively require out-of-state firms to "become a resident in order to compete on

2  equal terms" have discriminatory effects and are per se invalid.[53]   The Supreme Court most

3  recently addressed this principle in *Granholm v. Heald*.  Interstate wine producers challenged

4  New York's winery law that allowed out-of-state wine producers to sell to in-state customers

5  only "if [they became] a licensed New York winery, which requires the establishment of 'a

6  branch factory, office[,] or storeroom within the state of New York.'"[54]   The state defended the

7  scheme by arguing "that an out-of-state winery has the same access to [New York's] consumers

8  as in-state wineries: All wine must be sold through a licensee fully accountable to New York; it

9  just so happens that in order to become a licensee, a winery must have a physical presence in the

10  [s]tate."[55]   But the High Court found that requiring wineries to open a branch office or storeroom

11  in New York would drive up the cost of out-of-state producer's wine and was prohibitively

12  expensive for most wineries—to the point where no out-of-state winery had opened an in-state

13  location.[56]   On those facts, it found that New York's "in-state presence requirement [ran]

14  contrary to our admonition that [s]tates cannot require an out-of-state firm 'to become a resident

15  _____

16  (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977)) ("The Supreme Court has also found discrimination when a law imposes costs on out-of-staters that in-state residents

17  would not have to bear."); *Hunt*, 432 U.S. at 350–52 (finding that a facially neutral statute discriminated against interstate commerce by "raising the costs of doing business in the North

18  Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected" and stripping away the Washington apple growers'

19  competitive advantage); *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 n.16 (1978) ("If the effect of a state regulation is to cause local goods to constitute a larger share, and goods

20  with an out-of-state source to constitute a smaller share, of the total sales in the market . . . the regulation may have a discriminatory effect on interstate commerce.").

21  [53] *Granholm v. Heald*, 544 U.S. 460, 475 (2005) (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64 (1963), then citing *Ward v. Maryland*, 12 Wall. 418 (1871)).

22  [54] *Id.* at 470 (citing N.Y. Alco. Bev. Cont. Law Ann. § 3(37)) (cleaned up).

23  [55] *Id.* at 474 (cleaned up).

[56] *Id.* at 474–75.

1  in order to compete on equal terms,'" and the Court had "no difficulty concluding that New

2  York['s winery law] . . . discriminate[d] against interstate commerce" so it was per se invalid.[57]

3         While *Heald* shows that Eisenberg's theory that an in-state presence requirement may per

4  se violate the dormant Commerce Clause is cognizable,[58] neither party attempts to compare the

5  burdens imposed by Nevada's office requirement to those in *Heald*.  The only binding case that

6  either party cites on this issue or compares this case to is *Rosenblatt v. City of Santa Monica*,[59] in

7  which the Ninth Circuit upheld a city ordinance that prohibited short-term rentals unless the

8  primary resident remained in the dwelling.[60]  The State asserts that *Rosenblatt* stands for the

9  proposition that state laws that only indirectly or incidentally affect interstate commerce are not

10 per se violations and that Nevada's in-state presence requirement only incidentally

11 inconveniences out-of-state brokers.[61]  But the *Rosenblatt* panel did not determine that in-state

12 presence requirements are an incidental burden and always evaluated under *Pike*.[62]  Rather, it

13 side-stepped the in-state presence requirement issue because, as the panel interpreted the statute,

14 the primary resident in the dwelling did not need to be the owner of the dwelling.[63]

15        In fact, the *Rosenblatt* court acknowledged that both the Ninth Circuit and the Supreme

16 Court—in cases like *Heald*—have struck down as per se violations state laws that impose

17

18 [57] *Id.* at 475–76 (cleaned up) (quoting *Halliburton Oil Well Cementing*, 373 U.S. 64, then citing *Ward*, 12 Wall. 418).

19
20 [58] *See id.*; *see also id.* at 494 (Stevens, J., dissenting) ("The New York and Michigan laws challenged in these cases would be patently invalid under well-settled dormant Commerce Clause principles if they regulated sales of an ordinary article of commerce").

21 [59] *See* ECF No. 24 at 3–4 (citing *Rosenblatt*, 940 F.3d 439).

   [60] *Rosenblatt*, 940 F.3d at 449–53.
22
   [61] *See* ECF No. 24 at 3–4 (citing *Rosenblatt*, 940 F.3d 439).

23 [62] *See Rosenblatt*, 940 F.3d at 449–53.

   [63] *Id.* at 450–451.

requirements so burdensome that they effectively require out-of-state firms to "become a resident in order to compete on equal terms."[64]  The *Rosenblatt* court distinguished its facts from that line of cases, noting that those cases generally involved substantially greater burdens and costs on out-of-state residents than Santa Monica's ordinance, which didn't necessarily require an out-of-state owner to live onsite.[65]  But the Ninth Circuit in *Rosenblatt* did not reject the proposition that a sufficiently onerous requirement could per se violate the dormant Commerce Clause.[66] And a review of the non-binding cases that both parties cite suggests that an in-state office requirement that imposes significant burdens and costs on the licensee can ripen into a per se violation like the one in *Heald*.

            a.     *The State's case law suggests that an in-state office requirement alone generally falls short of a per se violation.*

The State supports its position with two circuit-court cases upholding in-state office requirements for attorneys.[67]  In the Tenth Circuit case of *Kleinsmith v. Shurtleff*, a Utah statute required attorneys acting as trustees of real-property trust deeds to maintain offices in the state so they could meet with the trustee for foreclosure-related proceedings.[68]  But the statute did not require that the office act as a "bona fide" one because Kleinsmith had already successfully challenged that provision under the dormant Commerce Clause in a prior case.[69]  Renewing his constitutional challenge, Kleinsmith asserted that the in-state office requirement as a whole had a

---

[64] *Id.* at 451 n.5 (citing *Heald*, 544 U.S. 460 and *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 727 (9th Cir. 2017)).

[65] *Id.*

[66] *See id.*

[67] ECF No. 21 at 9.

[68] *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1036–37 (10th Cir. 2009).

[69] *Id.* at 1036.

discriminatory effect and per se violated the dormant Commerce Clause.[70]  But the district court granted summary judgment for the State, which the Tenth Circuit affirmed, because Kleinsmith failed to offer evidence that requiring him to maintain an office for a limited purpose stymied his or any out-of-state attorney's ability to compete in the Utah market.[71]

Likewise, the Third Circuit upheld a more stringent office requirement in *Tolchin v. Supreme Court of the State of New Jersey*.[72]  New Jersey's court rules required an attorney appearing in state court to maintain a "bona fide office" within the state,[73] defining a "bona fide office" as more than a maildrop, a substantially-unattended summer home, an answering service, or a place for an agent to receive and transmit messages.[74]  New York-based attorney Robert Tolchin filed suit challenging the rule on dormant Commerce Clause grounds.[75]  He theorized that those rules amounted to a per se violation because, "[j]ust as a law forbidding sleeping under a bridge falls more heavily on the shoulders of the indigent than on those of the wealthy, . . . these requirements fall more heavily on the shoulders of nonresidents than on those of residents."[76]  The Third Circuit was unmoved, however, and found no per se violation because the law did not facially discriminate as it required both in-state and out-of-state attorneys to

---

[70] *Id.* at 1037.

[71] *See id.* at 1040–43.

[72] *Tolchin v. Supreme Ct. of the State of N.J.*, 111 F.3d 1099, 1106–11 (3d Cir. 1997).

[73] *Id.* at 1102.

[74] *Id.* at 1102–03.  New Jersey's court rules also outline some potential indicia of a bona fide office: "It was a place where clients are met, files are kept, the telephone is answered, mail is received and the attorney or a responsible person acting on the attorney's behalf can be reached in person and by telephone during normal business hours to answer questions posed by the courts, clients or adversaries and to ensure that competent advice from the attorney can be obtained within a reasonable period of time."  *Id.*

[75] *Id.* at 1105.

[76] *Id.* at 1107.

1    maintain an office in state.[77]  Nor were there significant discriminatory effects because, in the

2    Third Circuit's opinion, any advantage in-state attorneys gained was minimal.[78]

3              b.        *The cases that Eisenberg cites suggest that an in-state office requirement*
                        *can amount to a per se violation if the law requires a substantial amount*
4                       *of business be conducted at that office.*

5              For his part, Eisenberg offers a trio of southern district-court cases and an unpublished

6    Ninth Circuit case that he claims invalidated in-state office requirements as per se violations of

7    the dormant Commerce Clause.[79]  These cases suggest that in-state office requirements ripen into

8    per se violations if they require the licensee to perform significant portions of their business at

9    that office.

10             In *Underhill Associates, Inc. v. Coleman*, the U.S. District Court for the Eastern District

11   of Virginia considered a Virginia statute that required stockbrokers to maintain a regular place of

12   business in Virginia.[80]  Three out-of-state brokers sued the state claiming that the cost was

13   prohibitive so the statute violated the dormant Commerce Clause.[81]  Virginia defended the law

14   by arguing that it did not discriminate because it applied equally to in-state and out-of-state

15   brokers.[82]  The court, however, found Virginia's "argument specious," reasoning that "[w]hile

16   the requirement is facially neutral, its obvious effect is prejudicial to out-of- state brokers, who

17   must duplicate the expense of maintaining an office in Virginia in order to do business with its

18

19

---

20   [77] *Id.*

     [78] *Id.* at 1107–08.

21   [79] ECF No. 23 at 6.

22   [80] *Underhill Assocs., Inc. v. Coleman*, 504 F. Supp. 1147, 1148–49 (E.D. Va. 1981), *aff'd sub nom. Underhill Assocs., Inc. v. Bradshaw*, 674 F.2d 293 (4th Cir. 1982).

23   [81] *Id.*

     [82] *Id.* at 1151.

14

residents."[83]  The court thus held that Virginia's requirement violated the dormant Commerce Clause.[84]

Likewise, in *Georgia Ass'n of Realtors v. Alabama Real Estate Commission*, Alabama's real-estate brokerage law required real-estate brokers to maintain an office in Alabama and to conduct all activity related to the license out of that office.[85]  Georgia-based real-estate brokers brought suit, alleging that the law violated the dormant Commerce Clause because it required out-of-state realtors to maintain duplicate offices or undertake the expense and inconvenience of moving their office in order to comply.[86]  The U.S. District Court for the Middle District of Alabama distinguished Alabama's situation from those in cases upholding in-state office requirements generally because Alabama's scheme required a broker to maintain a much more substantial "place of business" in the state.[87]  The court found that the cost of maintaining an in-state office imposed a considerable burden on interstate commerce.[88]  Citing *Pike*, it also recounted that, under Supreme Court precedent, "a statute requiring business operations to be performed in the home state which could be performed more efficiently elsewhere is 'virtually per se illegal.'"[89]  So the court invalidated the Alabama statute under the dormant Commerce Clause.[90]

---

[83] *Id.* (cleaned up).

[84] *Id.* at 1152.

[85] *Ga. Ass'n of Realtors, Inc. v. Ala. Real Est. Comm'n*, 748 F. Supp. 1487, 1489–90 (M.D. Ala. 1990).

[86] *Id.* at 1490–94.

[87] *Id.* at 1493–94.

[88] *Id.* at 1493.

[89] *Id.* at 1494 (quoting *Pike*, 397 U.S. 137).

[90] *Id.*

1    Similarly, in *Nutritional Support Services, L.P. v. Miller*, a Georgia statute required

2   healthcare-product suppliers for its Medicaid program to maintain an office within Georgia or

3   within 50 miles of the border.[91]  Two suppliers sued, asserting that the requirement violated the

4   dormant Commerce Clause.[92]  Relying on *Georgia Ass'n of Realtors*, the U.S. District Court for

5   the Northern District of Georgia struck down the law, finding that its "practical effect" was to

6   discriminate against providers outside the fifty-mile limit.[93]

7

8        c.    *Harmonizing these authorities suggests that Nevada's statutory scheme*
              *plausibly violates the dormant Commerce Clause per se.*

9    The final case Eisenberg cites demonstrates that these cases can be reconciled.  In the

10  unpublished case of *Codar, Inc. v. Arizona*, the Ninth Circuit considered Arizona's statute

11  governing debt collection, which required collectors to maintain an office in Arizona and to use

12  that office "for collection of claims" in Arizona.[94]  The panel noted that several courts had

13  reached different outcomes on this issue, but in each case the likelihood of finding a per se

14  violation increased proportionally to the burden that the in-state office requirement imposed.[95]

15  Thus, a "regular place of business requirement is per se unconstitutional, and subject to higher

16  level scrutiny, while an in-state office merely for holding records and allowing audits is

17  permissible if [its] benefits are not clearly outweighed by the burden to out-of-state firms."[96]

18  And because the Arizona statute feasibly required debt collectors to operate in state, the Ninth

19

---

20  [91] *Nutritional Support Servs., L.P. v. Miller*, 830 F. Supp. 625, 626 (N.D. Ga. 1993).

    [92] *Id.*

21  [93] *Id.* at 628.

22  [94] *Codar, Inc. v. Arizona*, 95 F.3d 1156, at *4 (9th Cir. 1996) (table dispo.) (citing Ariz. Rev.
    Stat. Ann. §§ 32-1051(2), 32-1024(4)).

23  [95] *See id.* at *3–4.

    [96] *Id.* at *3 (cleaned up).

1  Circuit remanded the case to the district court to determine whether it violated the dormant

2  Commerce Clause.[97]

3      I find *Codar*'s delineation persuasive and consistent with Supreme Court precedent.  In

4  each of the cases cited by the parties, the statutes imposed office requirements with varying

5  degrees of additional burdens.  The *Kleinsmith* law mandated an in-state office but only required

6  attorneys to conduct very specific transactions there.[98]  The statute in *Tolchin* required a "bona

7  fide office," but such an office only needed to be more than an unattended summer home and

8  have some functionality.[99]  While in *Underhill Associates*, *Georgia Ass'n of Realtors*, and

9  *Nutritional Support Services*, the statutory schemes required the respective licensees to conduct

10  either substantial amounts or all of the transactions related to the licenses at their in-state

11  offices.[100]  As the Supreme Court acknowledged in *Pike* and *Heald*, because economic activity

12  can be performed more efficiently elsewhere, forcing interstate competitors to conduct theirs in-

13  state could plausibly reduce the competitiveness of similarly situated interstate competitors and

14  act as a barrier to entry.[101]  Recognizing that such a law requiring in-state presence could ripen

15  into a per se violation generally comports with Supreme Court precedent striking down local

16

17  _____

[97] *Id.* at *4.

18  [98] *See Kleinsmith*, 571 F.3d at 1036–37.

19  [99] *See Tolchin*, 111 F.3d at 1102–03.

20  [100] *See Ga. Ass'n of Realtors*, 748 F. Supp. at 1489–90; *Underhill Assocs*, 504 F. Supp. at 1148–49; *Nutritional Support Servs.*, 830 F. Supp. at 626.

21  [101] *See Pike*, 397 U.S. at 145 ("For the Court has viewed with particular suspicion state statutes
22  requiring business operations to be performed in the home State that could more efficiently be
performed elsewhere."); *Heald*, 544 U.S. at 475 (striking down law as having a discriminatory
impact when it allowed in-state wineries to sell wine directly to consumers but prohibited out-of-
23  state wineries from selling wine unless the winery paid for an in-state location because "the
expense of establishing a bricks-and-mortar distribution operation in 1 State, let alone all 50, is
prohibitive").

processing requirements as both per se violations of the dormant Commerce Clause and as excessive burdens on interstate commerce.[102] It also heeds the Supreme Court's "admonition that States cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'"[103]

Nevada's statutory scheme skews toward the in-state requirements invalidated by the *Georgia Ass'n of Realtors* line of cases. Eisenberg has alleged that the laws effectively require him to become a resident to compete and that he has accrued additional costs as a result, like paying rent on a Nevada-based office, redirecting deliveries to that office, paying any accompanying fees, paying for staff, and paying for space for physical records in that office.[104] While in-state brokers must bear many of those same expenses, those costs are doubled for out-of-state brokers and those activities may be done more cost-effectively in their home state. Eisenberg also alleges that an out-of-state broker must travel to Nevada to conduct any transaction that his Nevada license authorizes.[105] It is plausible that these costs are so

---

[102] *See, e.g.*, *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994) ("the flow control ordinance is just one more instance of local processing requirements that we long have held invalid"); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354–56 (1951) (finding that ordinance requiring producers to bottle milk within five miles of Madison discriminated against interstate commerce); *Minnesota v. Barber*, 136 U.S. 313, 329–30 (1890) (invalidating requirement that meat be inspected in state); *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 6, 13 (1928) (invalidating requirement that shrimp be processed in state before leaving the state); *Johnson v. Haydel*, 278 U.S. 16, 16–17 (1928) (invalidating similar requirement for oysters); *Toomer v. Witsell*, 334 U.S. 385, 406 (1948) (invalidating requirement that shrimp be unloaded and packaged in state before leaving the state); *Pike*, 397 U.S. at 145 (invalidating law requiring cantaloupes grown in state to be packaged in state); *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 100 (1984) (invalidating law requiring timber harvested in state to be processed in state); *Heald*, 544 U.S. at 475–76 (invalidating law requiring wineries to open an in-state location to sell locally).

[103] *Heald*, 544 U.S. at 475–76 (quoting *Halliburton Oil Well Cementing*, 373 U.S. 64, then citing *Ward*, 12 Wall. 418).

[104] ECF No. 1 at 6.

[105] *Id.*

1    burdensome that they could potentially ripen into a per se violation, so Eisenberg has plausibly

2    alleged that Nevada's brokerage laws have a discriminatory impact and per se violate the

3    dormant Commerce Clause.

4

### 2. Eisenberg has plausibly alleged that the statutory scheme imposes a significant burden on interstate commerce.

6    Even if a state law does not discriminate, it may still violate the dormant Commerce

7    Clause under the *Pike* balancing test.[106]  Under *Pike*, courts will uphold state laws if they

8    "effectuate[] a legitimate local public interest unless the burden imposed on interstate commerce

9    is clearly excessive in relation to the putative local benefits."[107]  At the motion-to-dismiss stage,

10   a plaintiff must also plausibly allege that the law places a significant burden on interstate

11   commerce.[108]  "[F]acts that render that outcome a 'speculative' possibility are not enough."[109]

12   Eisenberg analogizes this situation to *Pike*.[110]  Arizona law required cantaloupe growers

13   to package their cantaloupes within Arizona.[111]  A company growing cantaloupes on the border

14   of California brought a challenge under the dormant Commerce Clause, alleging that the Arizona

15   law prevented it from using its California-based packing plant and would require the company to

16   build and operate a redundant $200,000 packing plant in Arizona.[112]  The Supreme Court

17   concluded that the burden significantly outweighed any benefit from the state's justification for

18

19
_____

20   [106] *Rosenblatt*, 940 F.3d at 451.

     [107] *Id.* (quoting *Pike*, 397 U.S. 137) (cleaned up).

21   [108] *Id.* at 452.

     [109] *Nat'l Pork Producers*, 598 U.S. at 385.

22   [110] ECF No. 23 at 9.

23   [111] *Pike*, 397 U.S. at 138–39.

     [112] *Id.* at 139–40.

the law, which was to enhance the reputation of Arizonan cantaloupe growers.[113]  In doing so, the High Court observed that "state statutes requiring business operations to be performed in the home state that could more efficiently be performed elsewhere" so rarely outweigh their costs that they border on "virtually per se illegal."[114]

Like Arizona did in *Pike*, here, the State has offered several justifications for the scheme: it helps prevent fraud and gives clients and regulators access to brokers.[115]  But Eisenberg has identified many costs that may unduly burden out-of-state brokers and interstate commerce.[116]  And given that the Supreme Court has approached local-processing requirements with significant skepticism and found that they excessively burden interstate commerce compared to any benefits,[117] it is plausible that the statutory scheme fails the *Pike* balancing test.

*Tolchin* and the other cases that the State cites do not counsel a different result.[118]  In *Tolchin*, after concluding that there was no per se violation, the Third Circuit analyzed whether the bona fide office requirement was nonetheless invalid under the *Pike* balancing test.[119]  The court noted that the requirement burdened interstate commerce by forcing a "limited class of

---

[113] *Id.* at 144–45.

[114] *Id.* at 145 (cleaned up).

[115] ECF No. 21 at 10.

[116] *See* ECF No. 1 at 6; *see also supra* at 18–19.

[117] *See, e.g.*, *C & A Carbone*, 511 U.S. at 390–91; *Dean Milk*, 340 U.S. at 354–56; *Pike*, 397 U.S. at 145; *Heald*, 544 U.S. at 475.

[118] The State also cites the district court decision *Marcus & Millichap Real Est. Inv. Servs. of Nev., Inc. v. Decker*, in which a judge in this district found that having a real-estate licensing scheme generally did not violate the dormant Commerce Clause.  400 F. Supp. 3d 1074, 1081 (D. Nev. 2019), *rev'd and remanded sub nom. Marcus & Millichap Real Est. Inv. Servs. of Nev., Inc. v. Chandra*, 822 F. App'x 597 (9th Cir. 2020); ECF No. 21 at 7–9.  But that case did not address whether the individual aspects of the brokerage statute challenged here violated the dormant Commerce Clause.  *See generally Marcus & Millichap*, 822 F. App'x 597.

[119] *Tolchin*, 111 F.3d at 1108.

attorneys" to acquire offices and "limit[ed] the mobility of some lawyers and reduce[d] the options for consumers of the services they provide."[120]  The court also recounted that "the United States Supreme Court [has] held that there is no rational relationship between [in-state office] requirement[s] and attorney competence" and the requirement did little to advance attorney accountability.[121]  But the requirement did make attorneys more accessible to clients, and there had been disciplinary issues with unavailable attorneys.[122]  Based on those facts, the Third Circuit concluded that the "burden on interstate commerce [did] not *clearly* outweigh the benefit received from the bona fide office requirement."[123]

While the *Tolchin* court found that New Jersey's in-state office requirement passed the *Pike* balancing test, it relied on a highly factual analysis and that was specific to attorneys.  The court also based its decision on the burdens not clearly outweighing the benefits.  Such a fact-based analysis is best performed at summary judgment.  Because I find that Eisenberg has plausibly alleged that Nevada's brokerage laws violate the dormant Commerce Clause, I deny the motion to dismiss this claim.  But coffee's for closers only, so he will need evidence that this scheme impedes interstate brokers from competing in order to survive a properly supported motion for summary judgment.[124]

---

[120] *Id.* at 1109.

[121] *Id.* at 1108–09 (citing *Frazier v. Heebe*, 482 U.S. 641 (1987)).

[122] *Id.*

[123] *Id.* at 1109.  The State also cites *Kleinsmith* to argue that in-state office requirements should be upheld under *Pike*.  ECF No. 21 at 10.  But the *Kleinsmith* court did not conduct a *Pike* balancing.  *See Kleinsmith*, 571 F.3d at 1043.  Instead, it concluded that "Kleinsmith failed to present any evidence to challenge" the State's justification for the law and similarly failed to "produce[] evidence of any burden that the challenged law imposes on interstate commerce." *Id.* So *Kleinsmith* is not helpful at this motion-to-dismiss stage.

[124] *Cf. Underhill Assocs.*, 504 F. Supp. at 1152 (stockbroker-plaintiff challenging residency requirement satisfied burden when "the evidence indicate[d] that the cost of maintaining a full-time office in Virginia [was] approximately $67,800.00 per year"); *Kleinsmith*, 571 F.3d at

**C.    Eisenberg's Article IV Privileges and Immunities Clause claim is barred because he failed to allege facial discrimination or a protectionist purpose.**

Eisenberg also challenges the statutory scheme under the Privileges and Immunities Clause of Article IV.  To assert such a claim, a "plaintiff must show that the challenged law treats nonresidents differently from residents and impinges upon a 'fundamental' privilege or immunity protected by the Clause."[125]  But the clause does "not guard against" the same "discrimination scrutinized under the dormant Commerce Clause,"[126] and it "does not require that a state tailor its every action to avoid any incidental effect on out-of-state tradesmen."[127]  Instead, a plaintiff must show that the challenged law was intentionally enacted for a protectionist purpose.[128]  Facial discrimination may support that inference,[129] but it is not required.[130]

Recognizing that the statutory scheme does not discriminate on its face, Eisenberg asserts in his brief that his complaint sufficiently "alleged that Nevada's in-state requirements

---

1043–44 (quoting *Baude v. Heath*, 538 F.3d 608, 612 (7th Cir. 2008)) ("Any balancing approach, of which *Pike* is an example, requires evidence.  It is impossible to tell whether a burden on interstate commerce is clearly excessive in relation to the putative local benefits without understanding the magnitude of both burdens and benefits.  Exact figures are not essential (no more than estimates may be possible) and the evidence need not be in the record if it is subject to judicial notice, but it takes more than lawyers' talk to condemn a statute under *Pike*.")

[125] *Marilley v. Bonham*, 844 F.3d 841, 846 (9th Cir. 2016).

[126] *Tenn. Wine & Spirits Retailers Ass'n*, 588 U.S. at 516.

[127] *McBurney v. Young*, 569 U.S. 221, 229 (2013) (cleaned up).

[128] *Id.*

[129] *See Marilley*, 844 F.3d at 846.

[130] *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 67 (2003) ("we agree with petitioners that the absence of an express statement in the California laws and regulations identifying out-of-state citizenship as a basis for disparate treatment is not a sufficient basis for rejecting [an Article IV Privileges and Immunities Clause] claim").

intentionally g[a]ve its own citizens a competitive advantage in business or employment."[131]  But

Eisenberg's complaint contains only facts suggesting that the statute has a discriminatory

impact—nothing in his complaint alleges that the Nevada legislature intentionally enacted the

brokerage statute with protectionist aims.[132]  And both parties agree that discriminatory effects

alone are insufficient.[133]  So I dismiss his Article IV Privileges and Immunities Clause claim

with leave to amend to allege specific facts showing that the statutes were enacted for

protectionist purposes.

**D.    Eisenberg cannot proceed on his Equal Protection Clause and Due Process Clause claims because the brokerage statute survives rational-basis review.**

The Fourteenth Amendment's Equal Protection Clause bars states from "deny[ing] to any

person within its jurisdiction the equal protection of the laws."[134]  Strict scrutiny applies to any

state law or regulation that differently "classifies by race, alienage, or national origin" or

significantly burdens a class's exercise of a fundamental right.[135]  If strict scrutiny doesn't apply,

rational-basis review does.[136]  Neither party disputes that rational-basis review applies to

Eisenberg's equal-protection claim.[137]  Similarly, the Fourteenth Amendment's Due Process

---

[131] ECF No. 23 at 12.

[132] *See generally* ECF No 1.

[133] *See* ECF No. 21 at 11; ECF No. 23 at 12.

[134] U.S. Const. amend. XIV, § 1.

[135] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Graham v. Richardson*, 403 U.S. 365, 375 (1971).

[136] *City of Cleburne*, 473 U.S. at 440 ("The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." (citations omitted)); *Gregory v. Ashcroft*, 501 U.S. 452, 470–71 (1991) ("In cases where a classification burdens neither a suspect group nor a fundamental interest, courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws." (cleaned up)).

[137] *See* ECF No. 23 at 11.

Clause includes "a substantive component that protects certain individual liberties from state interference."[138]  When no fundamental liberty interest is involved, which Eisenberg concedes is the case here,[139] rational-basis review also applies.[140]

Under rational-basis review, a law must be upheld if there is any reasonably conceivable set of facts that could provide a rational basis for the law.[141]  "[T]hose attacking the rationality of the legislative classification have the burden 'to negat[e] every conceivable basis [that] might support it.'"[142]  "[A]ny conceivable rational basis" will "suffice" to preserve the law.[143]  Courts are also "extremely deferential to" state laws "in actions challenging regulation of licensed professions."[144]

Eisenberg relies on a footnote in the Ninth Circuit's opinion in *Merrifield v. Lockyer* to argue that an economically-protectionist law "[that serves] no end other than protecting favored groups from economic competition" is irrational.[145]  While that could be true in certain situations, the *Merrifield* court noted that is not dispositive—"there might be instances when economic protectionism might be related to a legitimate governmental interest and survive rational-basis review."[146]  The State also argues that the law serves other ends.  It contends that

---

[138] *Health Freedom Def. Fund, Inc. v. Carvalho*, 148 F.4th 1020, 1029 (9th Cir. 2025) (quoting *Mullins v. Oregon*, 57 F.3d 789, 793 (9th Cir. 1995)).

[139] *See* ECF No. 23 at 13–14.

[140] *Health Freedom Def. Fund*, 148 F.4th at 1029.

[141] *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

[142] *Id.* at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

[143] *Health Freedom Def. Fund*, 148 F.4th at 1029 (quoting *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir.)).

[144] *Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Berch*, 773 F.3d 1037, 1045 (9th Cir. 2014) (quoting *Lupert v. Cal. State Bar*, 761 F.2d 1325, 1328 (9th Cir. 1985)).

[145] *Merrifield v. Lockyer*, 547 F.3d 978, 991 n.15 (9th Cir. 2008).

[146] *Id.* (cleaned up)

1    the requirements help ensure that brokers "are knowledgeable of the applicable state law and

2    subject to professional standards that help prevent fraud and ensure minimum competence,"[147]

3    and that having an in-state office helps assure that the brokers' clients and state investigators

4    have ready access to the brokers.[148]    Eisenberg has not rebutted these offered explanations nor is

5    it plausible to allege that this law lacks some rational connection to those legitimate goals, even

6    if it does so poorly.    So Eisenberg has not plausibly alleged that the statutory scheme lacks a

7    rational basis, and I dismiss his equal-protection and due-process claims without leave to amend

8    because amendment would be futile.[149]

9
10    **E.    The *Slaughter-House Cases* bar Eisenberg's Fourteenth Amendment's Privileges or Immunities Clause claim.**

11            The Privileges or Immunities Clause of the Fourteenth Amendment states that "[n]o State

12    shall make or enforce any law which shall abridge the privileges or immunities of citizens of the

13    United States."[150]    Shortly after the Civil War and the Fourteenth Amendment's enactment,

14    butchers challenged Louisiana's grant of a monopoly to a slaughterhouse under this clause,

15    asserting that the monopoly abridged the butchers' privilege and "right to exercise their trade."[151]

16    But the Supreme Court rejected that theory and held that "the Privileges [or] Immunities Clause

17    of the Fourteenth Amendment only protects" the very narrow "rights accruing from citizenship

18
19
20    _____

[147] ECF No. 21 at 9.

21    [148] ECF No. 24 at 6.

22    [149] *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018) (requests to amend should be denied if a proposed amendment would be futile).

23    [150] U.S. Const. amend. XIV, § 1.

[151] *Slaughter-House Cases*, 83 U.S. 36, 60 (1872).

of the United States."[152]  Given the "tight boundaries" "the Supreme Court drew around" the

clause in the *Slaughter-House Cases*,[153] it is now widely recognized that almost any argument

based on this clause is a "constitutional non-starter."[154]  And it is a non-starter in this particular

case because "the right to engage in one's profession of choice [is] not protected by the

Privileges or Immunities Clause" under the *Slaughter-House Cases*.[155]

       Eisenberg counters that the *Slaughter-House Cases* were incorrectly decided, that the

Privileges or Immunities Clause protects "the right to earn a living," and that the statutory

scheme runs afoul of that privilege.[156]  But he concedes that *Slaughter-House* forecloses that

interpretation and that he only pled this claim to preserve it for appeal.[157]  So I dismiss it without

leave to amend because amendment would be futile.[158]

---

[152] *See Nat'l Ass'n for the Advancement of Multijurisdiction Prac.*, 773 F.3d at 1046 (citing *Slaughter–House*, 83 U.S. 36).

[153] *Merrifield*, 547 F.3d at 983.

[154] *Paciulan v. George*, 229 F.3d 1226, 1229 (9th Cir. 2000) (quoting Kevin Christopher Newsom, *Setting Incorporationism Straight: A Reinterpretation of the Slaughter–House Cases*, 109 Yale L.J. 643, 646 (2000)).

[155] *Merrifield*, 547 F.3d at 983 (citing *Slaughter–House Cases*, 83 U.S. 36 and *Corfield v. Coryell*, 6 F.Cas. 546 (C.C.E.D. Pa. 1823)).

[156] ECF No. 23 at 15 (citing *McDonald v. City of Chicago*, 561 U.S. 742, 854 (2010) (Thomas, J., concurring)).

[157] *Id.*

[158] The parties also contest the scope of relief that Eisenberg asks for.  Eisenberg's complaint prays for "a declaration that Nev. Rev. Stat. §§ 645.510 and 645.550 and Nev. Admin. Code §§ 645.627 and 645.655 facially violate" the United States Constitution and for the court to enter "[a] permanent injunction prohibiting" the enforcement of "Nev. Rev. Stat. §§ 645.510 and 645.550 and Nev. Admin. Code §§ 645.627 and 645.655." ECF No. 1 at 12.  The State contends that Eisenberg is attempting to declare the whole licensure scheme unconstitutional.  ECF No. 24 at 2.  But Eisenberg claims that he does not seek such broad relief or "to eliminate licensure standards that actually ensure brokers are competent or qualified."  ECF No. 23 at 4.  Instead, he only "challenges the constitutionality of specific laws that discriminate against out-of-state brokers and impose irrational requirements on the industry."  *Id.*  Thus, Eisenberg may continue to seek relief under his Commerce Clause claim to the extent that he challenges the requirement that real-estate brokers keep an in-state office, transact business authorized by their license at

**Conclusion**

IT IS THEREFORE ORDERED that the State's motion to dismiss **[ECF No. 21]** is **GRANTED** in part and **DENIED** in part:

- Eisenberg's claim under the Privileges and Immunities Clause of Article IV is **DISMISSED** with leave to amend.

- Eisenberg's claims under the Privileges or Immunities Clause of the Fourteenth Amendment, the Equal Protection Clause, and the Due Process Clause are **DISMISSED** without leave to amend.

- Eisenberg's claim under the Commerce Clause may proceed to the extent that he challenges:

  - The requirement that real-estate brokers must keep an in-state office;
  - The requirement that real-estate brokers must transact business authorized by their license at that office;
  - The requirement that real-estate brokers must maintain physical records for inspection at that office; and
  - The regulation allowing brokers with a home to designate a room as an office.

Eisenberg may file an amended complaint by November 6, 2025, for the limited amendment permitted by this order. If he fails to file an amended complaint by this deadline, this case will proceed on his dormant Commerce Clause claim only.

_____
U.S. District Judge Jennifer A. Dorsey
October 17, 2025

---

that office, and maintain physical records for inspection at that office. Likewise, neither party addresses the regulation allowing brokers with a home to designate a room as an office, so Eisenberg may continue to seek relief on that regulation.