**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Derek Eisenberg,<br><br>Plaintiff<br><br>v.<br><br>Dr. Kristopher Sanchez, et al.,<br><br>Defendants | Case No.: 2:24-cv-02377-JAD-MDC<br><br>**Order Resolving Summary Judgment Motions**<br><br>[ECF Nos. 30, 34] |

Nevada's real-estate laws require brokers to keep an in-state office, transact all business authorized by their license from that office, and maintain records for inspection at that office. In-state brokers, however, may use their home as an office. So New Jersey-based real-estate broker Derek Eisenberg, who operates a virtual real-estate business, challenges the statutory scheme under the dormant Commerce Clause.

Both Eisenberg and the State move for summary judgment under Federal Rule of Civil Procedure 56. Eisenberg argues that the requirement that he transact all Nevada business from a Nevada office can only be construed as an unconstitutional residency or local-processing requirement, while the requirements to maintain an in-state office and keep records there unduly burden out-of-state brokers with costs that in-state brokers can avoid. The State argues that, in practice, it does not require that all work be conducted out of an in-state office, and it otherwise contends that the statutory scheme passes constitutional muster because it imposes either the same burdens on in-state and out-of-state brokers or a minimal burden on out-of-state brokers.

I find that the requirement that real-estate brokers transact all business authorized by their license at an in-state office violates the dormant Commerce Clause. But Eisenberg has not

shown that the remaining requirements are so unconstitutionally burdensome as to overcome the deference that courts afford state legislatures to regulate licensed industries like real estate. I thus deem the requirement that real-estate brokers must conduct licensed business from an in-state office unconstitutional. But because Eisenberg does not address the appropriate remedies in his summary-judgment motion, I construe it as one on liability only, and I give him one more opportunity to file a final summary-judgment motion addressing only the relief that he seeks for the in-office work requirement.

**Background**

Chapter 645 of the Nevada Revised Statutes (NRS) regulates real-estate brokers. NRS 645.550(1) requires brokers to "maintain a definite place of business within the State . . . which must serve as the office for the transaction of business under the authority of the license." NRS 645.510 states that "[n]o real estate license . . . shall give authority to do or perform any act specified in this chapter . . . from any place of business other than that specified therein." And NRS 645.550(3) provides that "[n]o license authorizes the licensee to transact business from any office other than that designated in the license."

The Nevada Administrative Code (NAC) contains additional requirements for real-estate brokers. NAC 645.655 requires brokers to maintain a complete record of each real-estate transaction in their Nevada offices and to make those records available for inspection.[1] The regulation permits those records to be stored electronically, as long as a computer with access to those records is made available to the regulators.[2] NAC 645.627 allows brokers to operate their

[1] Nev. Admin. Code § 645.655(2).

[2] *Id.* at § 645.655(3).

offices out of their homes, as long as they can "set aside a separate room or rooms for conducting [their] real-estate business."[3]

Eisenberg is a real-estate broker based in New Jersey and licensed in 26 states, including Nevada.[4] He maintains a single office in the state consistent with the statutory scheme.[5] But he contends that the in-state office requirements are unconstitutional and anticompetitive, so he sues the Director of the Department of Business and Industry, Nevada Real Estate Division (Dr. Kristopher Sanchez) and the members of the Nevada Real Estate Commission (Darrell Plummer, Donna A. Ruthe, Forrest Barbee, David Tina, and William Bradley Spires) (collectively "the State").[6] All parties agree that Nevada may validly license real-estate brokers. But Eisenberg prays for a declaration that the following requirements violate the Commerce Clause, and he seeks to enjoin their enforcement:[7]

- The requirement that real-estate brokers must keep an in-state office (the in-state office requirement);
- The requirement that real-estate brokers must transact all business authorized by their license from that office (the in-office work requirement);
- The requirement that real-estate brokers must maintain physical records for inspection at that office (the records requirement); and
- The regulation allowing brokers to operate their office from a room in their home (the home-office provision).

---

[3] *Id.* at § 645.627 (cleaned up).

[4] ECF No. 1 at 5–6.

[5] *Id.* at 6.

[6] *Id.* at 4.

[7] *Id.* at 12.

Eisenberg argues that the in-office work requirement is an impermissible residency and local-processing requirement and thus per se violates the dormant Commerce Clause. Eisenberg also challenges the remaining requirements as either discriminating in practice against out-of-state brokers or imposing costs far in excess of their putative benefits. He notes that his local office costs him $1,500 in annual rent plus other costs and logistical inconveniences associated with "managing a ghost office," like rerouting mail.[8] He argues that the purported benefits of the restrictions are purely illusory and do not outweigh the costs to out-of-state brokers. Finally, he contends that the home-office provision allows in-state brokers to use their existing infrastructure while requiring him to pay a brick-and-mortar entry fee for a market that his online business can serve from his primary office in New Jersey.

The State crossmoves for summary judgment, arguing that Eisenberg's draconian interpretation of the in-office work requirement does not align with the State's "practical approach" to enforcing it.[9] The State concedes that it does not actually require brokers to conduct all of their business from their office, and it presents evidence showing that the rule would be enforced only if a client or the regulatory authorities requested an in-office visit and were denied.[10] It also contends that its interests in regulating the real-estate industry outweigh the de minimus costs of renting a shared office space and keeping records there. The State further argues that the home-office requirement does not discriminate against out-of-state brokers because they are free to rent or own a "secondary or vacation home" in Nevada and conduct their business from it, just like local brokers.[11]

---

[8] ECF No. 30 at 6.

[9] ECF No. 34 at 4.

[10] *Id.*

[11] ECF No. 39 at 5.

**Discussion**

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[12] The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[13] If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[14]

Who bears the burden of proof on the factual issue in question is critical. When the party moving for summary judgment would bear the burden of proof at trial, "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial."[15] Once the moving party establishes the absence of a genuine issue of fact on each issue material to its case, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense."[16] When instead the opposing party would have the burden of proof on a dispositive issue at trial, the moving party doesn't have to produce evidence to negate the opponent's claim; it merely has to point out the evidence that shows an absence of a genuine material factual issue.[17] The movant need only defeat one

---

[12] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[13] *Id.* at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

[14] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes*, 67 F.3d 816, 819 (9th Cir. 1995).

[15] *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (cleaned up)).

[16] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (cleaned up).

[17] *See, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

element of the claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[18] "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[19]

### A. The dormant Commerce Clause prohibits state laws that burden interstate commerce.

"The Commerce Clause affirmatively grants to Congress the power to regulate interstate commerce."[20] "The undisputed corollary of that principle is that the Commerce Clause . . . by its own force created an area of trade free from interference by the [s]tates."[21] This "negative" or "dormant" effect of the Commerce Clause displaces any economically protectionist state laws "designed to benefit in-state economic interests by burdening out-of-state competitors."[22]

At the same time, "[t]he Constitution does not prohibit legislatures from enacting stupid laws."[23] State legislatures are restrained only by their own Constitution or the Constitution of the United States, and "[c]ourts should be careful not to extend [constitutional] prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular

---

[18] *Celotex*, 477 U.S. at 322.

[19] *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

[20] *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 443–44 (9th Cir. 2019).

[21] *Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388, 403 (1984) (cleaned up).

[22] *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023).

[23] *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 209 (2008) (Stevens, J., concurring); *Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 714 (7th Cir. 2016) (quoting Jennifer Senior, *In Conversation: Antonin Scalia*, New York Magazine, Oct. 6, 2013) ("Justice Scalia once said that he wished all federal judges were given a stamp that read 'stupid but constitutional.'").

[c]ourt may happen to entertain."[24] "Extreme caution" thus "is warranted before a court deploys its implied authority under the dormant Commerce Clause."[25]

Challenges under the dormant Commerce Clause are two tiered. First, a court will invalidate a state law as a per se violation if it "directly regulates" interstate commerce[26] or "discriminates against interstate commerce on its face or in practical effect."[27] Otherwise, the court will apply the balancing test articulated in *Pike v. Bruce Church, Inc.*, which invalidates a law "if the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."[28] Dormant Commerce Clause jurisprudence is a "quagmire"[29] that "has ebbed and flowed over time"[30]—"no clear line separate[s] the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the" *Pike* balancing test.[31] Although the Supreme Court has occasionally invalidated state laws as per se violations in recent years,[32] it "has not invalidated a law under *Pike* in more than 30 years."[33]

---

[24] *Ferguson v. Skrupa*, 372 U.S. 726, 729 (1963) (quoting *Tyson & Brother, etc. v. Banton*, 273 U.S. 418, 445 (1927) (Holmes, J., dissenting)).

[25] *Peridot Tree WA, Inc. v. Wash. State Liquor & Cannabis Control Bd.*, 162 F.4th 1179, 1181 (9th Cir. 2026) (cleaned up).

[26] *Rosenblatt*, 940 F.3d at 444.

[27] *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 402 (1994).

[28] *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 145 (1970).

[29] *Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959).

[30] *Flynt v. Bonta*, 131 F.4th 918, 923 (9th Cir. 2025).

[31] *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986).

[32] *See, e.g.*, *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 543 (2019).

[33] *Flynt*, 131 F.4th at 931 (quoting *Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023)) (cleaned up).

And it is the role of the lower courts to apply the Supreme Court's Commerce Clause jurisprudence "faithful to its moorings and objectives."[34]

**B. The in-office work requirement per se violates the dormant Commerce Clause, but the remaining regulations do not.**

Eisenberg contends that each requirement per se violates the dormant Commerce Clause. Such a violation occurs if the law discriminates between in-state and out-of-state residents. Discrimination is the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."[35] A state law may discriminate facially, purposefully, or in practical effect.[36] A law discriminates in practical effect if it would cause out-of-state residents to suffer a "competitive disadvantage as compared to other similarly situated" in-state residents.[37] But even if the law is discriminatory, a showing that it is narrowly

---

[34] *Peridot Tree WA, Inc.*, 162 F.4th at 1185.

[35] *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1234 (9th Cir. 2010).

[36] *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009).

[37] *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 400 (9th Cir. 2015) (finding that the district court "considered measures well-suited to evaluating the effects of the ordinance" when it evaluated whether the ordinance increased the costs for a particular type of business model, created barriers to entry, raised the labor costs in a way that will impact the flow of interstate commerce, caused franchisees to close or reduce operations, or generally affected interstate commerce); *Rosenblatt*, 940 F.3d at 448 ("The Supreme Court has also found discrimination when a law imposes costs on out-of-staters that in-state residents would not have to bear." (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350–51 (1977))); *Hunt*, 432 U.S. at 350–52 (finding that a facially neutral statute discriminated against interstate commerce by increasing plaintiff's costs of doing business and stripping away their competitive advantage); *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 (1978) ("If the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market . . . the regulation may have a discriminatory effect on interstate commerce.").

tailored to "advance a legitimate local purpose" may still sustain it.[38] The party challenging a regulation has the burden of showing a discriminatory purpose or effect.[39]

### *1. The requirement that brokers work from their in-state office per se violates the dormant commerce clause.*

State laws that require out-of-state firms to effectively "become a resident in order to compete on equal terms" have discriminatory effects and may be per se invalid.[40] Requirements that goods or services be processed locally similarly may per se violate the dormant Commerce Clause.[41] It thus follows that requirements that out-of-state professionals must perform normal business operations from in-state offices "must be struck down as per se unconstitutional, unless [the state] can demonstrate that it has a legitimate local purpose for requiring an in-state office, that cannot be served by less discriminatory means."[42]

Eisenberg argues that NRS 645.510 and 645.550(1)'s requirement that brokers must conduct "any act" in their in-state office per se violates the dormant Commerce Clause. He theorizes that this requirement amounts to a residency and local-processing requirement, and the Supreme Court has previously invalidated both types of requirements under the dormant Commerce Clause.

As written, NRS 645.510 and 645.550(1) leave brokers with just two options: become a resident (a residency requirement) or obtain an office—or a vacation or secondary home as the

---

[38] *Flynt*, 131 F.4th at 923.

[39] *Int'l Franchise Ass'n, Inc.*, 803 F.3d at 400.

[40] *Granholm v. Heald*, 544 U.S. 460, 475 (2005) (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64 (1963), then citing *Ward v. Maryland*, 12 Wall. 418 (1871)).

[41] *C & A Carbone, Inc.*, 511 U.S. at 391–92.

[42] *Codar, Inc. v. Arizona*, 95 F.3d 1156, at *4 (9th Cir. 1996).

State suggests—and process their work in Nevada (a local-processing requirement).[43] The dormant Commerce Clause forbids both.

The State's primary argument in support of the in-office work requirement is that regulators take a "practical approach" to the requirement when they enforce it. It explains that it interprets this requirement to require only that an "office must be available 'if the client requests to transact business there.'"[44] But the State's liberal interpretation does not save these statutes from the dormant Commerce Clause because a court may not "uphold an unconstitutional statute merely because the Government promised to use it responsibly."[45]

Moreover, the statute's language does not support the lax interpretation the State suggests. NRS 645.510 expressly states that real-estate licenses do not give brokers the authority "to do or perform *any act* specified in this chapter . . . from *any place of business* other than that specified therein."[46] And NRS 645.550(1) repeats that "no license authorizes the license to transact business from any office other than that designated in the license." This is a textbook local-processing requirement. The State's selective enforcement can't transform it into something else. Plus the State doesn't provide any evidence to show that this requirement serves any constitutionally permissive purpose. I thus find that NRS 645.510 and 645.550(1)'s

---

[43] The State argues that "[t]he legislative intent could not conceivably have been to require a Nevada licensee broker to literally perform all of their real estate business activities within the physical confines of their Nevada office, because the practice of real estate necessarily requires the licensee to occasionally visit properties with their clients and to take out-of-office meetings." ECF No. 39 at 9. Even if that is true, the law still contemplates that the majority of work would be done in Nevada.

[44] ECF No. 34 at 4.

[45] *United States v. Stevens*, 559 U.S. 460, 480 (2010); *Doe v. Harris*, 772 F.3d 563, 580–81 (9th Cir. 2014) ("[T]he promise from the State that it will use the power appropriately is not sufficient.").

[46] Nev. Rev. Stat. § 645.510 (emphasis added).

requirement that brokers conduct "any act" in their in-state office only is unconstitutional as a per se violation of the dormant Commerce Clause.

### *2. The remaining requirements are not per se violations.*

With the in-office work requirement excised, the statutory scheme and regulations still require that brokers obtain an in-state office and maintain records there, while in-state brokers may use their own home. Eisenberg insists that these remaining requirements per se violate the dormant Commerce Clause because they discriminate against out-of-state brokers in practical effect. Eisenberg asserts that the requirements cost him approximately $1,500 in annual rent and other incidental costs like redirection of mail, deliveries, a local newspaper ad, and a business license.[47] By operating from their homes, in-state brokers can avoid many of these costs, he explains.

A state law discriminates in practical effect if it would cause out-of-state residents to suffer a "competitive disadvantage as compared to other similarly situated" in-state residents.[48] A plaintiff may demonstrate this discriminatory effect by showing a declining market share[49] or a loss of a competitive advantage.[50] The Ninth Circuit has found that factors "well-suited to evaluating the effects of [an] ordinance" on a service-providing business include whether the

---

[47] ECF No. 30-3 at ¶¶ 11–15 (Eisenberg's declaration).

[48] *Int'l Franchise Ass'n*, 803 F.3d at 400.

[49] *Exxon Corp.*, 437 U.S. at 126 ("If the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market . . . the regulation may have a discriminatory effect on interstate commerce.").

[50] *Rosenblatt*, 940 F.3d at 448 ("The Supreme Court has also found discrimination when a law imposes costs on out-of-staters that in-state residents would not have to bear." (citing *Hunt*, 432 U.S. at 350–51))); *Hunt*, 432 U.S. at 350–52 (finding that a facially neutral statute discriminated against interstate commerce by increasing plaintiff's costs of doing business and stripping away their competitive advantage).

ordinance increases the costs for a particular type of business model, creates barriers to entry, raises labor costs in a way that would impact the flow of interstate commerce, causes franchisees to close or reduce operations, or generally affects interstate commerce.[51]

Based on considerations like these, courts have held that costly office-location requirements per se violate the dormant Commerce Clause. For example, in *Underhill Associates, Inc. v. Coleman*, the U.S. District Court for the Eastern District of Virginia considered a Virginia statute that required stockbrokers to maintain a regular place of business in Virginia.[52] Three out-of-state brokers sued the state, claiming that the cost was prohibitive so the statute violated the dormant Commerce Clause.[53] The court found "that the burden of the requirement on out-of-state brokers, and on interstate commerce, cannot be deemed merely incidental" because the plaintiffs offered "evidence indicat[ing] that the cost of maintaining a full-time office in Virginia is approximately $67,800.00 per year."[54] The court reasoned that, "[w]hile the requirement is facially neutral, its obvious effect is prejudicial to out-of-state brokers, who must duplicate the expense of maintaining an office in Virginia in order to do business with its residents."[55] The court thus concluded that Virginia's requirement violated the dormant Commerce Clause.[56]

---

[51] *Int'l Franchise Ass'n*, 803 F.3d at 400.

[52] *Underhill Assocs., Inc. v. Coleman*, 504 F. Supp. 1147, 1148–49 (E.D. Va. 1981), *aff'd sub nom. Underhill Assocs., Inc. v. Bradshaw*, 674 F.2d 293 (4th Cir. 1982).

[53] *Id.*

[54] *Id.* at 1152.

[55] *Id.* at 1151 (cleaned up).

[56] *Id.* at 1152.

The United States Supreme Court similarly condemned onerous physical-location requirements in *Granholm v. Heald*.[57] In that case, interstate wine producers challenged New York's winery law that allowed out-of-state wine producers to sell to in-state customers only "if [they became] a licensed New York winery, which requires the establishment of 'a branch factory, office[,] or storeroom within the state of New York.'"[58] The state defended the scheme by arguing "that an out-of-state winery has the same access to [New York's] consumers as in-state wineries: All wine must be sold through a licensee fully accountable to New York; it just so happens that in order to become a licensee, a winery must have a physical presence in the [s]tate."[59] But the High Court found that requiring wineries to open a branch office or storeroom in New York would drive up the cost of an out-of-state producer's wine and was prohibitively expensive for most wineries, to the point where no out-of-state winery had opened an in-state location.[60] On those facts, the Court found that New York's "in-state presence requirement [ran] contrary to our admonition that [s]tates cannot require an out-of-state firm 'to become a resident in order to compete on equal terms,'" and the Court had "no difficulty concluding that New York['s winery law] . . . discriminate[d] against interstate commerce" so it was per se invalid.[61]

But courts will not find a per se violation without evidence of a discriminatory effect. In the Tenth Circuit case of *Kleinsmith v. Shurtleff*, a Utah statute required attorneys acting as trustees of real-property trust deeds to maintain offices in the state so they could meet with the

---

[57] *Granholm*, 544 U.S. 460.

[58] *Id.* at 470 (citing N.Y. Alco. Bev. Cont. Law Ann. § 3(37)) (cleaned up).

[59] *Id.* at 474 (cleaned up).

[60] *Id.* at 474–75.

[61] *Id.* at 475–76 (cleaned up) (quoting *Halliburton Oil Well Cementing*, 373 U.S. at 72, then citing *Ward*, 12 Wall. 418).

trustee for foreclosure-related proceedings.[62] But the statute did not require that the office act as a "bona fide" one or require attorneys to conduct all business there because Kleinsmith had already successfully challenged that provision (along with a residency requirement) under the dormant Commerce Clause in a prior case.[63] Renewing his constitutional challenge, Kleinsmith asserted that the in-state office requirement as a whole had a discriminatory effect and per se violated the dormant Commerce Clause.[64] But the district court granted summary judgment for the state, which the Tenth Circuit affirmed, because Kleinsmith failed to offer evidence that requiring him to maintain an office for a limited purpose stymied his or any out-of-state attorney's ability to compete in the Utah market.[65]

Eisenberg's evidentiary proffer is more akin to that in *Kleinsmith* than in *Heald* or *Underhill.* He has not shown that what remains of the office requirement imposes costs sufficiently onerous to warrant a finding of a per se violation. While allowing in-state realtors to use their homes as offices may allow them to avoid the $1,500 expenditure that Eisenberg shells out annually for this extra office, he has not established that this de minimus sum confers a significant competitive advantage over out-of-state brokers or significantly impacts out-of-state brokers' market share.[66] In other words, Eisenberg has not shown these requirements are

[62] *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1036–37 (10th Cir. 2009).

[63] *Id.* at 1036.

[64] *Id.* at 1037.

[65] *See id.* at 1042.

[66] Relatedly, Eisenberg also claims that the Nevada's law impedes his "innovative" remote business model. "But the dormant Commerce Clause does not protect a 'particular structure or metho[d] of operation.'" *Nat'l Pork Producers Council*, 598 U.S. at 385 (quoting *Exxon*, 437 U.S. at 127).

sufficiently discriminatory to amount to per se violations. So, as the Ninth Circuit has held, these requirements must "be analyzed under the [*Pike*] balancing test."[67]

**C. Eisenberg hasn't shown that the remaining regulations unduly burden interstate commerce under the *Pike* balancing test.**

Even if a plaintiff cannot show that a law inflicts a competitive disadvantage as compared to other similarly situated in-state residents, it may still violate the dormant Commerce Clause if it fails the *Pike* balancing test.[68] Under *Pike*, courts will uphold a state law if it "effectuates a legitimate local public interest unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits."[69]

To maintain his Nevada license while residing out of state, Eisenberg is required to rent a commercial office that serves no operational purpose. This mandate imposes approximately $1,500 in annual rent on his business for a "ghost office" that generates no revenue and serves no clients.[70] Eisenberg also must arrange and pay for the redirection of mail and deliveries from the shell office to his actual, operating office in New Jersey to ensure that vital transaction documents are not lost or delayed.

The State offers several justifications for the scheme. It contends that the in-state office requirement allows the State to achieve "important public policy goals," including "establishing legal jurisdiction; facilitating governance of licensee activities; ensuring compliance with statutory and regulatory operational and taxation obligations; and ensuring reliable business operations and credibility of licensees, individually, and confidence in Nevada's real estate

---

[67] *Codar, Inc.*, 95 F.3d at *4.

[68] *Rosenblatt*, 940 F.3d at 451.

[69] *Id.* (cleaned up).

[70] ECF No. 30 at 6.

industry."[71] Eisenberg contends that these purported benefits don't have any valid connection to the in-state office requirement. He cites various cases holding that the State's interest in ensuring professional competence and compliance with local laws is untethered from the requirement of a brick-and-mortar presence.[72] He also contends that the State's interest in "regulatory oversight is illusory because the [State] admits [that] it does not actually use brokers' physical office for that purpose."[73] He points to testimony from Rebecca Bruce, the Chief Compliance Investigator for the Nevada Real Estate Division, conceding that brokers provide records via cloud servers and that audits are conducted remotely.[74]

The State's proffered reasons are dubious—physical presence for legal jurisdiction has been obsolete since *International Shoe*—but I cannot say that the costs are clearly excessive for whatever little benefit the State gains. In *National Association for Optometrists and Opticians v. Harris*, the Ninth Circuit confronted a similar instance in which the costs to out-of-state businesses to comply with a state statute, as well as the benefits to the state in enforcing the law, were both minimal.[75] But the court held that the low stakes on both sides benefited the state. It emphasized the fact that *Pike*'s balancing test is concerned with "putative benefits," not actual ones.[76] And it stressed that the focus must first be on whether the statute burdens interstate commerce, noting that, "[i]f a regulation merely has an effect on interstate commerce, but does

[71] ECF No. 39 at 12 (citing ECF No. 39-2 (the State's discovery responses)).

[72] ECF No. 30 at 17 (citing *Frazier v. Heebe*, 482 U.S. 641, 649 (1987); *Tolchin v. Sup. Ct. of the State of N.J.*, 111 F.3d 1099, 1108–09 (3d Cir. 1997); *Sup. Ct. of N.H. v. Piper*, 470 U.S. 274, 285 (1985)).

[73] *Id.*

[74] *Id.* at 17–18 (citing Bruce Dep. 53:10–14; 54:19–25).

[75] *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1155 (9th Cir. 2012).

[76] *Id.*

not impose a significant burden on interstate commerce, it follows that there cannot be a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits' under *Pike*."[77] The panel further rejected the plaintiff's argument that the state's purported benefits are illusory, holding that, "[i]n the absence of discrimination or another substantial burden on interstate commerce, [courts] need not determine if the benefits of a statute are illusory."[78]

I find that Eisenberg has not shown that the remaining regulations' impact on interstate commerce is significant. At most, Eisenberg must pay $1,500 in annual rent for a shared office space and expend incidental costs on routing mail, maintaining a business license, and taking ads out in local newspapers. As discussed *supra*, Eisenberg has not shown that those relatively minor costs impose a burden on interstate commerce.[79] So, because the burden of requiring all real-estate brokers to maintain an office in the state and keep digital records there is not "clearly excessive" in relation to the putative local benefits of those requirements, I cannot conclude under *Pike* that they are invalid. I thus grant the State's motion for summary judgment on those requirements, and I deny Eisenberg's.

**D. Eisenberg has not shown entitlement to injunctive relief.**

In his complaint, Eisenberg prays for "a permanent injunction prohibiting" the state from "enforcing Nev. Rev. Stat. §§ 645.510 and 645.550 and Nev. Admin. Code §§ 645.627 and 645.655."[80] But in his motion for summary judgment, in which Eisenberg contends that he is

---

[77] *Id.*

[78] *Id.*

[79] *See supra* at 15.

[80] ECF No. 1 at 12.

entitled to judgment on all remaining claims as a matter of law, he does not provide argument in support of the relief he seeks.[81]

"To be entitled to a permanent injunction, a plaintiff must demonstrate: (1) actual success on the merits; (2) that [he] has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction."[82] Eisenberg does not address these factors in his motion or otherwise seek specific relief. So I construe his summary-judgment motion as a partial one on liability only, and I give him 20 days to file a second and final summary-judgment motion on any injunctive relief that he contends that he is entitled to based on my finding that the in-office work requirement is unconstitutional.[83]

**Conclusion**

IT IS THEREFORE ORDERED that Derek Eisenberg's motion for summary judgment **[ECF No. 30] is GRANTED in part**: The in-office work requirement for real-estate professionals codified at NRS 645.510 and 645.550(1) constitutes a per se violation of the dormant Commerce Clause. The motion is DENIED in all other respects.

IT IS FURTHER ORDERED that the State's motion for summary judgment **[ECF No. 34] is GRANTED in part**: The in-state office requirement, record requirement, and home-

---

[81] *See* ECF No. 30.

[82] *Indep. Training and Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024, 1032 (9th Cir. 2013) (citing *eBay Inc. v. MercExch., LLC*, 547 U.S. 388, 391 (2006)). I also note that Eisenberg's request seems to ask for a universal injunction, which may no longer be available after the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). If Eisenberg chooses to seek partial summary judgment on his prayer for injunctive relief, he must either address *Trump v. CASA* or limit his requested injunction to apply only to him.

[83] Any motions for attorneys' fees or costs may be filed in accordance federal law and this district's local rules.

office provision do not violate the dormant Commerce Clause. The motion is DENIED in all other respects.

IT IS FURTHER ORDERED that **Eisenberg must file a final motion for summary judgment** on the relief he seeks based on my finding that the in-office work requirement is constitutionally invalid **by September 24, 2026**.

U.S. District Judge Jennifer A. Dorsey
September 3, 2026